**REVERSE in Part, MODIFY in Part, and AFFIRM; Opinion Filed August 11, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-01209-CV

**E.F. JOHNSON COMPANY, Appellant**
**V.**
**INFINITY GLOBAL TECHNOLOGY**
**F/K/A INFINITY GEAR AND TECHNOLOGY, LLC,**
**AND CHARLES KIRMUSS D/B/A KIRMUSS & ASSOCIATES, Appellees**

**On Appeal from the 95th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-11-14303-D**

## MEMORANDUM OPINION
Before Justices Fillmore, Stoddart, and O'Neill[1]
Opinion by Justice O'Neill

A jury found that appellant E.F. Johnson Company (EFJ) fraudulently induced appellees Infinity Global Technology f/k/a Infinity Gear and Technology, LLC (Infinity) and Charles Kirmuss d/b/a Kirmuss & Associates (Kirmuss) to enter into a Distribution Agreement. The jury found further that EFJ failed to comply with the terms of the Distribution Agreement. The jury assessed damages for both the fraudulent inducement and breach of contract; the trial court assessed attorney's fees. In seven issues, EFJ challenges: (1) the trial court's failure to apply a contractual limitation-of-liability provision, (2) Kirmuss's status as a party to the Distribution Agreement, (3) the sufficiency of the evidence supporting a finding of fraudulent intent, (4) the

---

[1] The Hon. Michael J. O'Neill, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

sufficiency of the evidence supporting the damages award, (5) the trial court's failure to require appellees to elect their remedy, (6) the basis and rate of prejudgment interest, and (7) the sufficiency of the evidence supporting the trial court's award of attorney's fees. Infinity and Kirmuss bring three cross issues, challenging the trial court's interest award and its segregation of attorney's fees as between them. We reverse the trial court's judgment in part, modify it in part, and affirm the remainder.

## BACKGROUND

Kirmuss operated an electronics business that specialized in radio-related products. In 2007, at a trade show in Hong Kong, he discovered a speaker microphone with a built-in global positioning system (the GPS-Mic), manufactured by Wintectronics (Wintec). Kirmuss believed the GPS-Mic could transform communications for first responders and military units, so he arranged to meet and discuss the product with Wintec's owner. After the meeting, Wintec granted Kirmuss the exclusive right to distribute and sell the GPS-Mic in North America.

Kirmuss visited Wintec's facility and then returned to the United States to share the new project with Lance McCullough, the president of Infinity. Kirmuss shared offices with Infinity, and Infinity was already a distributor for Kirmuss radio products. Kirmuss and Infinity promoted the GPS-Mic at conferences and trade shows, and a number of companies showed interest in marketing the product.

In February of 2008, EFJ discovered the GPS-Mic at a trade show in Las Vegas. On August 4, 2008, after significant negotiations, Kirmuss and Infinity and EFJ executed a Memorandum of Understanding (MOU). The MOU required Infinity to halt any negotiations or dealings with other parties concerning distribution rights to the GPS-Mic. In return, EFJ agreed that the parties' agreement would include a minimum purchase commitment of at least 50,000

units during a three-year term, with 12,500 units guaranteed to be purchased by EFJ in the first twelve months of the agreement.

The parties formalized the terms of their proposed agreement in their Distribution Agreement, which was effective November 24, 2008. They agreed Infinity would provide EFJ with 12,500 GPS-Mics within the first twelve months of the agreement's term. EFJ would pay $300 per unit, for a total of $3,750,000. EFJ guaranteed this minimum purchase for the first year; the Distribution Agreement called the commitment "irrevocable and non-cancellable." The parties further agreed Infinity would provide an additional 37,500 GPS-Mics over the next two years. Thus the three-year agreement was for Infinity to provide a total of 50,000 GPS-Mics and for EFJ to pay a total of $15 million.

Within a relatively short time, however, the parties' relationship began to falter. EFJ offered testimony that the GPS-Mics delivered by Infinity did not perform as they were represented. Appellees, on the other hand, offered testimony that EFJ failed to obtain an agreement to provide the GPS-Mics to the United States Army, and that EFJ invented excuses to get out of its contractual obligations. On November 4, 2009, EFJ provided written notice to Infinity that it was terminating the Distribution Agreement.

Infinity sued EFJ for breach of the Distribution Agreement and fraudulent inducement. Kirmuss later joined the suit as a plaintiff, claiming fraudulent inducement. The jury returned findings that EFJ had breached the Distribution Agreement with Infinity and that EFJ had fraudulently induced both appellees to enter into the agreement. The jury found damages in amounts between $1.2 million and $1.3 million on each claim. The trial court's judgment awarded Infinity $1,256,250 in actual damages without identifying the claim on which it was recovering. The judgment awarded Kirmuss $1,300,000 in actual damages.

–3–

The parties agreed below to try the issue of attorney's fees to the court after trial. Attorneys for both parties submitted affidavits opining as to reasonable and necessary attorney's fees for Infinity and Kirmuss. The trial court eventually awarded Infinity $1,276,913 and Kirmuss $535,322 as their reasonable and necessary attorney's fees. The court also awarded Infinity interest at eighteen percent and Kirmuss interest at five percent.

EFJ appeals, and Infinity and Kirmuss cross-appeal.

## EFJ'S APPEAL

EFJ raises seven issues in this Court.

### The Contractual Limitation-of-Liability Provision

In its first issue, EFJ contends the limitation-of-liability provision in the Distribution Agreement should cap recoveries by both appellees at $49,600, the amount actually paid to Infinity by EFJ before the latter refused to take or pay for any more units. The provision at issue, section 18.3 of the Distribution Agreement, contains two sentences and states in its entirety:

> **[1]** EXCEPT FOR A BREACH OF SECTION 22 (CONFIDENTIALITY) AND EITHER PARTY'S OBLIGATION OF INDEMNIFICATION UNDER SECTION 17 (INTELLECTUAL PROPERTY INDEMNIFICATION), IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY CONSEQUENTIAL, INDIRECT, EXEMPLARY, SPECIAL OR INCIDENTAL DAMAGES ARISING FROM OR RELATING TO THIS AGREEMENT, INCLUDING INABILITY TO USE PRODUCTS, SOFTWARE OR DOCUMENTATION, DAMAGES RELATING TO THE LOSS OF INFORMATION OR AUDIO, DEVICE INACCURACY, INABILITY TO LOCATE A PERSON OR AREA, LOSS OF DATA, COMPUTER PROGRAMS, PROFITS, BUSINESS GOODWILL, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. **[2]** EXCEPT FOR A BREACH OF SECTION 22 (CONFIDENTIALITY) AND EITHER PARTY'S OBLIGATION OF INDEMNIFICATION UNDER SECTION 17 (INTELLECTUAL PROPERTY INDEMNIFICATION), EACH PARTY'S TOTAL CUMULATIVE LIABILITY IN CONNECTION WITH THIS AGREEMENT AND THE [INFINITY] PRODUCTS, SOFTWARE, AND DOCUMENTATION WHETHER IN CONTRACT OR TORT OR OTHERWISE, WILL NOT EXCEED THE AMOUNT OF MONIES ACTUALLY PAID TO [INFINITY] BY EFJ UNDER THIS AGREEMENT.

The trial court instructed the jury not to consider this provision in making its award. Instead, the court reserved the issue to itself as a question of law. After trial, the parties briefed and argued the issue. The trial court did not apply the limitation in its judgment; it did not explain its reasoning.

EFJ contends the limitation provision should have limited the appellees' recovery to $49,600, which was the total amount EFJ had paid them before terminating the Distribution Agreement. EFJ relies on the Texas UCC to support what EFJ calls the plain language of the agreement. The relevant statute provides that:

> (1) the agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and

> (2) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

TEX. BUS. & COM. CODE ANN. § 2.719(a) (West 2009). EFJ argues the parties agreed to limit recoverable damages and to make those limited damages the sole remedy available for breach of the Distribution Agreement. EFJ states correctly that Texas courts "apply this UCC provision." *See, e.g., SAVA gumarska in kemijska industria d.d. v. Advanced Polymer Scis., Inc.*, 128 S.W.3d 304, 317 (Tex. App.—Dallas 2004, no pet.) ("In general, parties to a contract are free to limit or modify the remedies available for breach of their agreement.") (citing section 2.719); *Muss v. Mercedes-Benz of N. Am., Inc.*, 734 S.W.2d 155, 158 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) ("While a buyer and seller may freely negotiate to extend liability into the future with respect to nonconforming goods, they may also freely negotiate to limit such liability exclusively to repair and replacement costs.") (citing section 2.719). We agree that if, under the circumstances of this case, the Distribution Agreement's limitation-of-liability provision satisfies the standards of section 2.719, it should be enforced.

–5–

But appellees argue the limitation-of-liability provision does *not* satisfy the standards of section 2.719. Appellees look to that section's provision stating, "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title." TEX. BUS. & COM. CODE ANN. § 2.719(b). Appellees also rely on the official commentary for section 2.719. Reading these provisions together with those relied upon by EFJ, section 2.719 leaves parties free to fashion their own remedy and reasonable limitations on remedies are permitted. But the section does not allow parties to enforce a provision that deprives another of "minimum adequate remedies." *Id.* § 2.719, comment 1 (West 2009). Instead, parties "must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract." *Id.* If the parties' self-styled remedy fails to provide that "fair quantum of remedy," then it will be stricken, and the remedies provided by Chapter 2 of the business and commerce code will apply. *Id.* There is no "fair quantum of remedy" where remedies are limited in an unconscionable manner or "where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain." *Id.* Although the official comments following Texas's UCC provisions are not law, they are persuasive authority concerning interpretation of the statutory language. *Fetter v. Wells Fargo Bank Tex., N.A.*, 110 S.W.3d 683, 687 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

Appellees argue EFJ's interpretation of the limitation-of-liability provision causes the parties' remedy provision—and ultimately their agreement as a whole—to fail in its purpose. According to appellees, the contract's fundamental purpose was the agreement that Infinity would permit EFJ to act as exclusive distributor of the GPS-Mic in return for EFJ's "irrevocable and non-cancellable" promise to take and pay for a minimum purchase of the GPS-Mic over

three years.  Appellees argue that if EFJ is permitted to avoid its minimum-purchase obligation, they will be deprived of the substantial value of their bargain.  *See id.*

The interpretation of an unambiguous contract is a question of law that we review de novo.[2]  *MCI Tel. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999).  The primary objective of contract interpretation is to ascertain the intent of the parties as expressed in the written agreement.  *See Nat'l Union Fire Ins. Co. v. CBI Indus. Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).  We examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so no provision will be rendered meaningless.  *See City of Midland v. Waller*, 430 S.W.2d 473, 478 (Tex. 1968).  We review the trial court's legal conclusions de novo, and we will uphold the court's judgment if it can be sustained on any legal theory supported by the record.  *See BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex. 2002); *see also Young v. Gumfory,* 322 S.W.3d 731, 741 (Tex. App.—Dallas 2010, no pet.) ("We uphold conclusions of law if the judgment can be sustained on any legal theory supported by the evidence.").  In this case, the trial court concluded the limitation provision should not be applied, so if that conclusion can be sustained on a legal theory supported by the record, we will uphold it.

The first sentence of the Distribution Agreement's provision contains an agreement that there will be no consequential damages recovered other than in two exceptional cases, neither of which apply in this case.  Courts will enforce such a ban on consequential damages so long as the ban is not unconscionable.  *See SAVA*, 128 S.W.3d at 317; *see also* TEX. BUS. & COMM. CODE ANN. § 2.719(c).  The provision at issue goes on to disallow:

> indirect, exemplary, special or incidental damages arising from or relating to this agreement, including inability to use products, software or documentation, damages relating to the loss of information or audio, device inaccuracy, inability

---

[2] Neither party contends this limitation provision—or any other provision in the Distribution Agreement—is ambiguous.

> to locate a person or area, loss of data, computer programs, profits, [and] business goodwill, even if advised of the possibility of such damages.

It is fair to say that this first sentence of the limitation-of-liability provision disallows any recovery other than direct, actual damages.

The second sentence of the provision is critical to the parties' arguments in this case. It provides that "each party's total cumulative liability in connection with this agreement and the [Infinity] products, software, and documentation whether in contract or tort or otherwise, will not exceed the amount of monies actually paid to [Infinity] by EFJ under this agreement." The parties agree this provision is not ambiguous, so we limit our focus to the language of the sentence, in the context of the agreement as a whole. *See City of Midland*, 430 S.W.2d at 478.[3] Read in isolation, the sentence supports EFJ's interpretation: EFJ's total liability will not exceed the amount it has paid to Infinity. However, read in the context of the agreement as a whole, we agree with the trial court that the provision cannot be applied in this case. The comment to section 2.719 recognizes that a limitation of liability provision may, due to "circumstances" of a particular case, fail in its purpose or improperly operate to deny a party a "fair quantum of remedy." Here, the agreed-upon remedy might function well if the circumstances were shipment of a carton of damaged GPS-Mics: the remedy would be limited to refund of the amount paid for that carton. But under circumstances where the seller foregoes selling product to any other distributor because the buyer has made an "irrevocable and non-cancellable" minimum purchase commitment, the provision, if enforced, would effectively allow the buyer both to abandon its commitment and to avoid exposure to "minimum adequate remedies." Section 2.719 requires effect be given to "reasonable agreements" that limit remedies. We conclude the circumstances

---

[3] Given this limitation, we do not consider such arguments as whether the limitation was intended only for third-parties or whether a party is bound by invocation of a similar provision in other litigation.

of EFJ's breach—a breach that is not challenged on appeal—render the limitation-of-liability provision unreasonable and thus unenforceable.[4]

EFJ relies primarily on an unpublished federal opinion, *AssistMed, Inc. v. Conceptual Health Solutions, Inc.*, 2006 WL 3691003 (N.D. Tex. 2006), in which a similar limitation-of-liability provision is enforced. That opinion, however, involves a software license agreement rather than a sale of goods. Thus, Chapter 2 of the business and commerce code does not apply, and, indeed, section 2.719 is not discussed in any way in the *AssistMed* opinion. The license agreement in that case is not an exclusive dealings or minimum purchase agreement. Chapter 2 makes the "circumstances" critical in determining whether a limitation-of-liability provision will be enforced. The circumstances in *AssistMed* are not comparable to those in the case before us.

EFJ argues for the enforcement of a limitation-of-liability provision that would operate to deprive appellees of the substantial value of their bargain; we reject that argument. *See* TEX. BUS. & COMM. CODE ANN. § 2.719 comment 1. We resist the notion inherent in EFJ's argument that a contracting party can excuse its own performance by refusing to perform and can limit its own liability by refusing to pay what it promised to pay. Such a result would turn contract law on its head. We conclude the trial court did not err in refusing to enforce the limitation-of-liability provision in this case.

We overrule EFJ's first issue.

---

[4] We agree with appellees that EFJ's interpretation of the provision "creates a sliding scale that moves in the wrong direction." Thus, had EFJ complied with all its obligations but for a final small shipment, its damages could approach the entire value of the contract. But, as in this case, its abandonment of a three-year obligation with only minimal payment limits its damages to that minimal amount.

**Kirmuss's Status Under the Distribution Agreement**

The jury found that EFJ fraudulently induced Kirmuss into entering the Distribution Agreement. In its second issue, EFJ argues that, as a matter of law, Kirmuss never entered into that agreement. EFJ contends Kirmuss is not a party to the Distribution Agreement, has no rights or obligations under it, and suffered no damages flowing from it.[5]

At the outset, we address whether EFJ has preserved the issue of Kirmuss's status under the Distribution Agreement for our review. EFJ argues Kirmuss lacks the capacity both to sue on the Distribution Agreement and to recover under it. Both of these defensive theories implicate rule 93 of the Texas Rules of Civil Procedure, which requires verification by affidavit of a pleading setting up a plaintiff's legal capacity to sue and his right to recover in the capacity in which he sues. TEX. R. CIV. P. 93(1), (2). "A challenge to privity is a capacity issue . . . and requires compliance with rule 93." *King-Mays v. Nationwide Mut. Ins. Co.*, 194 S.W.3d 143, 145 (Tex. App.—Dallas 2006, pet. denied) (citing *Pledger v. Schoellkopf,* 762 S.W.2d 145, 145–46 (Tex. 1988) (per curiam)). A party who wishes to contest his opponent's capacity to sue must do so through a verified plea under rule 93. *Sw. Indus. Inv. Co., Inc. v. Berkeley House Inv'rs*, 695 S.W.2d 615, 617 (Tex. App.—Dallas 1985, writ ref'd n.r.e.) ("A party who fails to raise the issue of capacity through a verified plea waives that issue at trial and on appeal."). The Texas Supreme Court "ha[s] not hesitated in previous cases to hold that parties who do not follow rule 93's mandate waive any right to complain about the matter on appeal." *Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex. 1996).

---

[5] Alternatively, EFJ purports to rely on the timing of the execution of Kirmuss's agreements with Wintec and Infinity to argue Kirmuss was not induced by EFJ to enter the Distribution Agreement and did not rely on EFJ in doing so. This argument cites no authority and does not attempt to explain how the timing of the agreements with the manufacturer and Infinity—specifically referred to in section 12.6 of the Distribution Agreement and clearly negotiated by the same parties—somehow disproves elements of Kirmuss's fraud claim. We conclude this issue is not sufficiently briefed for our review. *See* TEX. R. APP. P. 38.1(i).

We have reviewed EFJ's Original Answer, General Denial and Affirmative Defense to the Petition of Charles Kirmuss. As the pleading's title suggests, the answer includes a general denial and the single affirmative defense of limitations. The answer contains no verified denial.

EFJ's reply brief concludes its argument on this point by stating emphatically: "***Any*** theory that lets Kirmuss sue on the Agreement fails as a matter of law." (Emphasis original.) To make this argument at trial or on appeal, EFJ was required to make a verified denial. By failing to do so, it has waived the argument. *See Nootsie*, 925 S.W.2d at 662.[6]

If we were to consider EFJ's status argument, we would nevertheless conclude that Kirmuss was a party to the Distribution Agreement. In the context of a contract for the sale of goods, "'Party' . . . means a person that has engaged in a transaction or made an agreement subject to this title." TEX. BUS. & COM. CODE ANN. § 1.201(b)(26) (West Supp. 2015) (made applicable to article 2 by § 2.103(d)). EFJ acknowledges that Kirmuss initialed each page of the Distribution Agreement. Kirmuss also signed and filled in a signature block printed on the agreement for Kirmuss & Associates under the statement: "The parties have executed this Agreement as of the Effective Date."

And as for obligations of Kirmuss under the Distribution Agreement, they are stated in detail in section 12.6, which we summarize here and reproduce in its entirety in the notes.[7] The

---

[6] We note that the issue of whether Kirmuss provided (or received) consideration for his participation in the Distribution Agreement is "raised" in a parenthetical in EFJ's brief. The defense of lack of consideration must also be raised by a verified pleading to avoid waiver. TEX. R. CIV. P. 93(9). Thus, even if lack of consideration were properly briefed, EFJ waived the defense by failing to plead and verify it.

[7] Paragraph 12.6 states:

The Parties to this Agreement understand the importance for EFJ to continue supplying products to their customers should [Infinity] (or any entity of its supply chain) become incapable or unwilling to perform their respective obligations in a timely manner. [Kirmuss] is the supplier to [Infinity] of all Products that [Infinity] is supplying to EFJ. In the Escrow Agreement that [Kirmuss] will execute with the contract manufacturer, within 60 days of EFJ's acceptance of First Article Deliverables [Kirmuss] will have on deposit in its favor in an Escrow account, the rights to manufacture all Products with all manufacturing and product "know how" should the contract manufacturer become insolvent, incapable, or unwilling to produce the products supplied to [Kirmuss] and [Infinity]. In this event, [Kirmuss] will directly replace the contract manufacturer. Should [Kirmuss] become insolvent, incapable or unwilling to perform its obligations, the [Kirmuss] Escrow Agreement transfers all escrow materials held in trust to [Infinity]. In this event, [Infinity] directly replaces [Kirmuss]. Should [Infinity] become insolvent, incapable, or unwilling to perform its obligations under this Agreement, [Kirmuss] (as a signatory to this Agreement) will assume all liabilities and obligations of [Infinity] under this Agreement. Finally, in the event the contract manufacturer becomes insolvent, incapable or unwilling to perform its obligations to [Kirmuss] and [Infinity], and both [Kirmuss] and [Infinity] are insolvent, incapable, or unwilling to continue to perform

paragraph embodies EFJ's effort to assure that each link in the chain of distribution of the GPS-Mics was guaranteed to continue delivery to EFJ. The section begins with the representation and acknowledgment that Kirmuss "is the supplier to [Infinity] of all Products that [Infinity] is supplying to EFJ." The paragraph then goes on to require Kirmuss to execute an escrow agreement with the manufacturer (i.e., Wintec); the escrow agreement would create an account holding both the right to manufacture the GPS-Mic and all "manufacturing and product 'know how.'" The escrow agreement was to require this information pass to Kirmuss—so that Kirmuss could replace the manufacturer—in the event the manufacturer became unable or unwilling to produce the product. In like manner, the paragraph requires the escrowed information to pass: to Infinity, if Kirmuss became unable or unwilling to perform; to Kirmuss, if Infinity became unable or unwilling to perform; and finally to EFJ itself, if the manufacturer, Kirmuss, and Infinity all became unable or unwilling to perform. The paragraph required Infinity and Kirmuss—specifically citing Kirmuss's obligations "as a signatory to this Agreement"—to create these escrow agreements in their own agreement and with any other individual in the "complete supply chain" so that the manufacture and supply of the product would always flow to EFJ. The paragraph concludes with a statement that failure by Infinity or Kirmuss to establish the escrow agreements called for by this paragraph "shall constitute a material breach of this Agreement." Of course, as a general rule, only a party to a contract can be responsible for a breach of that contract. *C & A Invs., Inc. v. Bonnet Res. Corp.*, 959 S.W.2d 258, 262 (Tex. App.—Dallas 1997, writ denied) (action for breach of contract cannot be maintained against

their respective obligations under this Agreement, the escrowed materials will be released to EFJ who will be named as a Preferred Beneficiary in the Escrow Agreement executed between [Kirmuss] and its contract manufacturer. In their respective agreements between themselves and the contract manufacturer, [Kirmuss] and [Infinity] will: (a) identify escrow materials identical to the escrow materials described in Exhibit E of this Agreement; (b) include release events which are identical to, or more favorable than, the release events described in Exhibit E, and (c) will include language similar to this Section 12.6 as a means of describing the complete supply chain relationship, including identification of all parties as Preferred Beneficiaries under the respective escrow agreements. [Infinity] or [Kirmuss] failure to establish the Escrow Agreement described in this Section and Exhibit E shall constitute a material breach of this Agreement.

person not party to contract); *Bernard Johnson, Inc. v. Cont'l Constructors, Inc.*, 630 S.W.2d 365, 369 (Tex. App.—Austin 1982, writ ref'd n.r.e.) (same).

We reject EFJ's argument that Kirmuss had no obligations under the Distribution Agreement. And as to rights under that contract, EFJ's independent promise to pay for the product supplied is not tied specifically to Infinity. Paragraph 9.1 of the Distribution Agreement states, "EFJ shall pay the purchase price for Product(s) specified in Exhibit A." At a minimum, then, Kirmuss's promise to step into Infinity's shoes if necessary means Kirmuss possessed a contingent right to payment.

As to whether Kirmuss's damages flowed from the Distribution Agreement, EFJ relies on *ISG State Operations, Inc. v. National Heritage Insurance Co., Inc.*, 234 S.W.3d 711, 718 (Tex. App.—Eastland 2007, pet. denied), which stresses that a fraudulent inducement claim must seek damages flowing from the executed contract procured by fraud. EFJ wants this principle to mean that fraudulent inducement cannot implicate, in any way, a related agreement between parties to the main agreement. But *ISG State Operations* does not speak to that question. Instead the Eastland court denied a party's recovery of damages for "profits it anticipated earning from an unexecuted contract." *Id.* (refusing to allow recovery of damages from alleged oral agreement that varied and enlarged parties' written agreement). *ISG State Operations* is not helpful to our analysis.

The language of the Distribution Agreement establishes that EFJ required Kirmuss to be contractually linked to the enterprise EFJ was undertaking. The record supports this understanding of EFJ's intent. Ed Kelley was EFJ's representative at the time the MOU and Distribution Agreement were executed. Kirmuss testified at trial that Kelley required Kirmuss's personal involvement beginning with signing the MOU. Kelly required Kirmuss's signature,

> to ensure that there was a proper link between all of the parties. I was the supplier. I was buying from Wintec. Lance was buying the product from me and

-- or Infinity, and Infinity was selling to E.F. Johnson. And this way here, all the players were identified, and obviously for other distribution agreement requirements as well.

In the end, Kirmuss promised to create the escrow account and to replace and take on all of Infinity's contractual obligations in return for its share of the purchase price of the product. The agreement as to how EFJ's payment would be split between Kirmuss and Infinity was their decision, but the terms of that split did not affect Kirmuss's obligations or EFJ's insistence that those obligations be solemnified in the Distribution Agreement. EFJ could not require the contractual presence and promises of Kirmuss and then deny Kirmuss's claim and allege it was not party to the contract.

We overrule EFJ's second issue.

### Sufficiency of Evidence of Fraudulent Intent

In its third issue, EFJ contends there is legally and factually insufficient evidence to support the jury's finding on fraudulent intent.

In a legal sufficiency review, we ask whether the evidence at trial—crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not—would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In a factual sufficiency review, we consider and weigh all the evidence, both in support of and contrary to the challenged finding. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam). We set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). In neither case will we substitute our judgment for that of the trier of fact or pass on the credibility of the witnesses. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

–14–

Fraudulent intent may be established by either direct or circumstantial evidence, and the subsequent failure to perform the promise, while not alone dispositive, can be considered with other factors to establish intent. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 526 (Tex. 1998); *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434–35 (Tex. 1986). Indeed, "breach combined with 'slight circumstantial evidence' of fraud is enough to support a verdict for fraudulent inducement." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006). We begin, therefore, by acknowledging EFJ's failure to perform its contractual promise, which is not challenged on appeal. And we look next to determine whether the record contains "slight circumstantial evidence" of fraudulent intent; we conclude the record contains more than that.

Lance McCullough, Infinity's owner, testified concerning the formation of Infinity's contractual relationship with EFJ. According to McCullough, EFJ was an attractive business partner for Infinity, because of EFJ's large number of potential outlets and its large sales force. EFJ wanted to distribute the GPS-Mics exclusively. Over a lengthy period of negotiations, Infinity made clear that the price of that exclusivity was the minimum purchase commitment of 50,000 units over three years. McCullough stated Infinity was not interested in an agreement whereby EFJ merely sold what it could:

> Q.     [W]hy not just rely on E.F. Johnson to sell the microphone and pay you and why would you have to have a minimum orders requirement to satisfy you?
>
> A.     Well, because we didn't control their sales force. We had no ability to dictate or control their sales, and so if they made no effort to sell, then if we relied on their sales, we would dry up, and so it was an absolute necessity that they took product without a contingent for them to sell product.

EFJ did commit to the minimum purchase Infinity required. Delivery began, and as EFJ looked to the possibility of a large contract with the Army, it tested the GPS-Mics. As time went by, McCullough grew concerned that EFJ was giving him inaccurate information concerning

problems with the product. He contacted Katherine Broadwell, the original program manager of the contract for EFJ, and he testified to what he learned from her:

Q.      What did Ms. Broadwell tell you about E.F. Johnson's intentions to perform this distribution agreement?

A.      She told me it was a setup and --

Q.      On what basis did Ms. Broadwell inform you that this contract was a setup?

A.      That only if they were to get a large sale to some customer, some military customer, would they abide by the terms of the contract.

Q.      How did she know that?

A.      I believe she had gained that knowledge while at E.F. Johnson negotiating the contract –

Broadwell herself testified at trial by video deposition. She stated that after negotiating the MOU between EFJ and Infinity, she had primary responsibility for negotiating the Distribution Agreement. She acknowledged that EFJ was an attractive business partner for Infinity because Infinity had no distribution ability, and EFJ did. She also acknowledged that for EFJ to obtain the exclusivity it wanted, it would have to guarantee sales. There was evidence that Broadwell and McCullough had a good working relationship, but she began to have difficulties with her supervisor, Ed Kelly, concerning the contract negotiations in August of 2008, and he took over her role as primary negotiator in September. Kelly terminated Broadwell's employment with EFJ at the end of November 2008.

Kelly testified as well. He denied that EFJ had addressed "a way out of the contract" if it were unable to obtain a sufficiently large contract for sale of the units. However, McCullough and Broadwell produced evidence the jury could have believed over Kelly's denial. Credibility is an issue for the jury, not this Court. *See Mar. Overseas Corp.*, 971 S.W.2d at 407.

Of course, EFJ was a distributor; its business was buying and re-selling products. All parties were aware that EFJ planned and intended to re-sell the GPS-Mics and that the Army was

the primary focus of EFJ's plans.[8]  This awareness of EFJ's preferences, however, did not afford EFJ the legal ability to enter into the Distribution Agreement with "conditional intent."  In terms of fraudulent intent, EFJ could not enter this contract with the "conditional" promise to take the minimum purchase only if it obtained the buyer it wanted.  Nor can it take the position that Infinity and Kirmuss should not, or could not, rely on EFJ's keeping its promise because they were aware EFJ might not obtain the buyer it wanted.

EFJ also argued its "partial performance" negates any fraudulent intent on its part.  However the jury could reasonably have concluded that the minimal performance EFJ relies upon was merely an effort to stall until it could determine whether it could successfully obtain the Army deal.  Such behavior was especially problematic given the exclusivity EFJ had bargained for:  Infinity was bound to EFJ and its concerns and demands during this time.  EFJ's "partial performance" could be seen as nothing more than a deceptive effort to keep Infinity believing EFJ was committed to its minimum purchase promise.

We conclude—whether we view only the evidence supporting fraudulent intent in the light most favorable to the verdict, or all the evidence as the jury heard it—there is sufficient evidence of EFJ's fraudulent intent.  We decide EFJ's third issue against it.

### Sufficiency of Evidence of Damages

In its fourth issue, EFJ contends insufficient evidence supports the jury's findings of actual damages because Infinity and Kirmuss did not prove they had the ability to fulfill their bargain beyond the number of units already delivered to EFJ.  We apply the same standards outlined above as we review the sufficiency of the evidence supporting the damages award.  *See City of Keller*, 168 S.W.3d at 827; *Ortiz*, 917 S.W.2d at 772.

---

[8]  Indeed Broadwell testified that the Army was not EFJ's only potential target market, stating that she and McCullough had specifically discussed "that there were other customer—well, there were other customers that would be interested as well."

EFJ's factual argument is based upon problems that developed between Infinity and Kirmuss when EFJ delayed in performing under the Distribution Agreement because of purported defects in the GPS-Mics. The Kirmuss-Infinity relationship became sufficiently strained that Kirmuss terminated his agreement with Infinity. EFJ argues that because Kirmuss terminated his supplier relationship with Infinity *before* EFJ terminated the Distribution Agreement, Infinity could not have delivered the number of units it promised, so it cannot claim it was damaged by EFJ's breach. EFJ argues further that Kirmuss's damages flow solely from Infinity's sales to EFJ, so if Infinity could not deliver product as promised, then Kirmuss has no evidence of damages either. EFJ summarizes its argument thus: "Infinity was 'dead in the water' at that point, and cannot claim damages based on the sale of the product that it did not have and could not get."

But the record does not support EFJ's concerns for Infinity's ability to deliver product as promised in the Distribution Agreement. Both McCullogh and Kirmuss testified that Kirmuss excepted EFJ orders from his termination of dealings with Infinity. Kirmuss confirmed he would have been able to supply Infinity with the products it needed to fill EFJ orders. Indeed, Kirmuss's termination letter, which was introduced into evidence, stated Kirmuss would continue to supply product for EFJ and more than a dozen other companies. The record, thus, established Kirmuss intended to honor its commitments to Infinity and EFJ.

EFJ's legal argument has an entirely different basis: the cases it cites address claims in which the damages sought are based on speculative profits or events.[9] In *Texas Instruments, Inc. v. Teletron Energy Management, Inc.*, 877 S.W.2d 276, 277 (Tex. 1994), for example, the designer of a novel programmable thermostat contracted to pay $32,200 in return for TI's

---

[9] EFJ bridges its dissonant factual and legal arguments using the awkward phrase that Infinity had only "hopeful speculation" of filling EFJ's orders once its agreement with Kirmuss had been terminated. The statement is disproved by the record and misleading as to the kind of speculation that is problematic in the cases cited.

building ten working prototypes of the thermostat in eleven weeks. When TI could not create the prototype after two years of trying, the designer sued, claiming expenses, breach of warranty damages, and $14 million in lost profits. *Id*. The jury awarded $500,000 in lost profits; the trial court refused to award that element of damages; the court of appeals modified the judgment to include the $500,000 award. *Id.* The supreme court vacated the award, saying, "Teletron's evidence that a strong market existed for its unique thermostat at a moderate price is beside the point; no such product ever existed." *Id.* at 281. This is the premise behind the general rule that lost profits for a new business may be too speculative to predict. But Infinity and Kirmuss did not seek lost profits as a measure of damages. Instead, they sought only the benefit of their bargain, based upon the agreed-upon purchase price of the GPS-Mics at issue. There is nothing speculative about the contract sales price.

EFJ also cites *City of Dallas v. Villages of Forest Hills, L.P., Phase 1*, 931 S.W.2d 601, 605–06 (Tex. App.—Dallas 1996, no pet.). In that case, an apartment complex owner developed a five-stage plan to rehabilitate his complex. *Id.* at 602. He applied to the City through a program intended to assist such rehabilitation, and the relevant City agency approved the request for funding the first phase of the plan. *Id.* at 603. However, the City was never able to find a lender to participate in the rehabilitation, and the program was later suspended by the City. The owner's loan was never funded. *Id.* After a bench trial, the trial court awarded the owner $360,705 plus attorney's fees and interest, but the court refused to award damages related to the later four stages of the project, concluding those damages were too speculative. *Id.* We affirmed the trial court's decision, stating that commencement of the future stages of the project was dependent on factors beyond the owner's control, so that damages associated with those future stages were too speculative to be recovered. *Id.* at 606. In the case before us, the Distribution Agreement was a multi-year contract, but the jury awarded only one year's damages. Moreover,

as we discussed above, those damages were not speculative at all, but represented the parties' agreed-upon price for the minimum product order.

EFJ's argument on this point fails both factually and legally. The evidence supports Infinity's ability to service the contract as it promised, and nothing about recovering one year's agreed-upon price can be characterized as speculative. We overrule EFJ's fourth issue.

**Prejudgment Interest**

In its sixth issue, EFJ argues the trial court incorrectly calculated prejudgment interest in this case. We review the trial court's award of prejudgment interest for an abuse of discretion. *Bufkin v. Bufkin*, 259 S.W.3d 343, 356 (Tex. App.—Dallas 2008, pet. denied).

Initially, EFJ complains that the trial court awarded interest on appellees' future damages, contending that all damages sought by Infinity and Kirmuss resulted from future deliveries they hoped to make under the Distribution Agreement. EFJ relies on the finance code's proscription: "Prejudgment interest may not be assessed or recovered on an award of future damages." TEX. FIN. CODE ANN. § 304.1045 (West 2006). We note at the outset that the subchapter in which the proscription is found applies only to cases involving wrongful death, personal injury, or property damage. *Id.* § 304.101. EFJ does not cite, and we have not found, a case applying section 304.1045 in a contract case. However, we need not reach the issue of the section's applicability in this case because we conclude the damage award in this case does not include future damages. "Future damages are the monetary equivalent of the harm or injuries *not yet actually sustained* by the plaintiffs/appellees, but which they will suffer from the date of judgment forward in time." *Missouri Pac. R. Co. v. Lemon*, 861 S.W.2d 501, 529 (Tex. App.—Houston [14th Dist.] 1993, writ dism'd by agreement). The Distribution Agreement had an effective date of November 24, 2008 and a three-year term. The trial court's final judgment was signed June 25,

2014. All damages resulting from EFJ's breach, regardless of the manner used to calculate them, accrued well before the date of judgment in this case. We reject EFJ's future-damages argument.

Under this issue, EFJ also argues the trial court erroneously applied an eighteen percent rate to Infinity's award of prejudgment interest. Section 9.3 of the Distribution Agreement provided:

> [P]ayments are considered late if any outstanding balance remains unpaid for forty six (46) calendar days from date of invoice. A late payment fee will be charged at one and one half percent (1.5%) monthly of the outstanding balance and prorated on a daily basis from date of invoice.

EFJ argues this provision does not apply here because it did not owe on any unpaid invoices at the time it terminated the Distribution Agreement. We cannot read this provision so narrowly. EFJ does not contest it breached its obligation under the Distribution Agreement to purchase 50,000 units from Infinity over the agreement's three-year term. However, once EFJ refused to take product, Infinity stopped sending invoices. Thus, it could be technically true that EFJ did not "owe on any unpaid invoices," but it cannot be said that EFJ did not have an outstanding balance. We cannot read the agreement's interest provision in a way that renders meaningless EFJ's breach of its contractual obligations to pay for the units it promised to receive. *See City of Midland*, 430 S.W.2d at 478.

In a breach of contract case, the prejudgment interest rate is the same as the postjudgment interest rate. *See Johnson & Higgins of Tex., Inc.*, 962 S.W.2d at 532. Postjudgment interest—and therefore prejudgment interest—in a case in which the contract provides for interest is the lesser of the interest rate specified in the contract or eighteen percent a year. TEX. FIN. CODE ANN. § 304.002 (West 2006). We conclude the trial court did not err by awarding Infinity prejudgment interest at the rate of eighteen percent. *See id.*

We overrule EFJ's sixth issue.

**Attorney's Fees**

In its seventh issue, EFJ challenges the trial court's awards of attorney's fees to Infinity and Kirmuss. EFJ includes five specific complaints concerning the trial court's fee award.[10] The award of attorney's fees generally rests in the sound discretion of the trial court. *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 761 (Tex. 2012).

*Applying the Contractual Limitation-of-Liability Provision*

First, EFJ argues the limitation-of-liability provision in the Distribution Agreement should apply to cap attorney's fees as well. We have concluded the limitation does not apply to the contract damages award in this case. Given that conclusion, we see no reasonable basis for applying the provision to the court's award of attorney's fees.

Moreover, we will not interpret one provision of a contract in a way that negates another provision. Instead, our goal is to "harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). Section 20.4 of the Distribution Agreement provides that "the losing Party in any litigation arising out of this Agreement shall pay the cost of litigation." All parties agree the phrase "cost of litigation" includes attorney's fees. The language concerning recovery of costs is straightforward; it refers neither to an upper limit on those costs nor to section 18.3, the limitation-of-liability provision. We conclude that application of the limitation-of-liability provision to the recovery of attorney's fees in this case would require reading a limitation into section 20.4 that the parties did not include or intend.

In addition, Infinity pleaded a separate ground for recovery of its attorney's fees: chapter 38 of the Texas Civil Practice and Remedies Code. This independent basis for recovery could

---

[10] EFJ's fourth complaint concerns the trial court's segregation of the attorney's fee award between Infinity and Kirmuss. We address that complaint below, together with the cross appellants' issue on segregation of fees.

not be affected by the contractual provision and thus would have supported a full recovery of Infinity's reasonable fees incurred in prosecuting its breach of contract claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2015).

*Using a Multiplier in Calculating Fees*

In its second and third sub-points, EFJ challenges the trial court's use of a multiplier in calculating the attorney's fees due Infinity and Kirmuss. EFJ initially challenges the reasonableness of the trial court's selection of 1.5 as the multiplier in this case.

The Texas Supreme Court has recently addressed the use of a multiplier in determining an attorney's fee award. *See El Apple I, Ltd.*, 370 S.W.3d at 760. The supreme court first described the proper method of calculating the "lodestar" or base amount of fees by multiplying the reasonable number of hours worked by a reasonable hourly rate for the service provider. *Id.* After making the lodestar calculation, the court stated, "The [trial] court may then adjust the base lodestar up or down (apply a multiplier), if relevant factors indicate an adjustment is necessary to reach a reasonable fee in the case." *Id.* The court looked to rule 42, governing class actions, which addresses calculation of attorney's fees using the lodestar method. *Id.* (citing TEX. R. CIV. P. 42(i)(1)). The rule states:

> In awarding attorney fees, the court must first determine a lodestar figure by multiplying the number of hours reasonably worked times a reasonable hourly rate. The attorney fees award must be in the range of 25% to 400% of the lodestar figure. In making these determinations, the court must consider the factors specified in Rule 1.04(b), TEX. DISCIPLINARY R. PROF. CONDUCT.

TEX. R. CIV. P. 42(i)(1). The supreme court stated that when the particular circumstances of the case made it appropriate, a trial court may use a multiplier to increase or decrease the lodestar figure so that the award will "approximate a reasonable fee." *El Apple I*, 370 S.W.3d at 764. And as to the size of the multiplier, the court stated "the lodestar method should not vary from claim to claim," so that trial courts should employ the same formula as in class actions. *See id.*

–23–

Thus, a trial court that concludes the circumstances of its case call for use of a multiplier, should choose one that results in an award "in the range of 25% to 400% of the lodestar figure." *See* TEX. R. CIV. P. 42(i)(1). Stated differently, a trial court should not reduce a fee award to less than one quarter of the lodestar and should not increase a fee award by more than four times the lodestar. *See id.*

The factors that must be considered in arriving at a multiplier are the eight factors enumerated in disciplinary rule 1.04(b).[11] Our review of the record establishes that appellees' counsel addressed these factors in arriving at the amount of fees he proposed as reasonable and necessary in this case. Moreover, the 1.5 multiplier he proposed is well within the acceptable range provided by the rules. But EFJ argues the evidence supporting the fee award is insufficient because the only evidence offered to prove the necessity of a multiplier was the attorney's testimony. We disagree. "[T]estimony from a party's attorney is taken as true as a matter of law and is alone sufficient to support an award of attorneys' fees if the testimony is clear, positive, direct, and free from contradiction." *Jarvis v. Rocanville Corp.*, 298 S.W.3d 305, 319 (Tex. App.—Dallas 2009, pet. denied).

---

[11] Those factors are:

1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

TEX. RULES DISCIPLINARY P. 1.04(b), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A-1 (West 2013).

EFJ goes on to argue that the evidence is insufficient to establish why this case had to be brought as a contingency-fee case. We find no authority requiring such a showing before a multiplier may be employed.[12] Nevertheless, our review of the record shows the issue was before the trial court in the form of argument of counsel:

> MR. SANDERSON: . . . . Because if you -- if you are -- if the rule is that you're never going to be allowed to get anything more than what the lodestar value comes out to, then why are you going to agree to take a case like Infinity where you got Lance [McCullogh] and Charles [Kirmuss] fighting over whether the product worked, all those facts and uncertainties on the front end, agree --

> THE COURT: No, I --

> MR. SANDERSON: -- agree to wait two years?

We conclude the difficulties inherent in prosecuting this case were sufficiently presented on the record to the court.

The supreme court has stated that when it is appropriate under the circumstances of a case, a trial court may use a multiplier to increase the lodestar figure to approximate a reasonable fee. *El Apple I, Ltd*., 370 S.W.3d at 764. Indeed, "Texas courts . . . consistently allow the use of a multiplier to compensate for the uncertainty of recovery in contingent-fee cases." *La Ventana Ranch Owners' Ass'n, Inc. v. Davis*, 363 S.W.3d 632, 650 (Tex. App.—Austin 2011, pet. denied). As we have determined, the multiplier used in this case is on the low end of the approved range. We conclude the evidence is sufficient to support the trial court's use of the 1.5 multiplier in this case.

EFJ then argues that no evidence supports the reasonableness of the fee awards in this case in light of the amount in controversy and the results obtained by appellees. Application of the multiplier, EFJ contends, took the fee award to an unreasonable level given the degree of

---

[12] EFJ relies here on *ViewPoint Bank v. Allied Prop. & Cas. Ins. Co.*, 439 S.W.3d 626 (Tex. App.—Dallas 2014, pet. denied). We resolved that case against awarding the fees requested because: "The affidavit in this case, even though not controverted, is not clear about the method used to determine the amount of attorney's fees." *Id.* at 638. The attorney did not testify to the hours worked or to the rates charged.

In this case, appellees' evidence included both details of the hours worked and rates charged.

–25–

success appellees experienced in the trial court. Again, we disagree. Appellees succeeded on both of their substantive claims against EFJ, for breach of contract and fraudulent inducement. The jury awarded each plaintiff damages between $1.2 and 1.3 million on its claim(s). We conclude ample evidence supports the amount of fees awarded by the trial court, and we cannot say—given the significant degree of appellees' success—that it was an abuse of discretion for the trial court to award the amount of fees it did.

*Attorney's Fees for Tort Recovery*

Finally, EFJ asserts the judgment improperly awards Kirmuss attorney's fees on a tort claim. On this matter, we agree with EFJ. Kirmuss contends his fraudulent inducement claim arises under the Distribution Agreement. However, "[t]he duty not to fraudulently procure a contract arises from the general obligations of law rather than the contract itself." *Tony Gullo Motors I, L.P.*, 212 S.W.3d at 304. Settled Texas law disallows recovery of attorney's fees for a fraud claim. *See id.* at 310. Indeed, the supreme court has rejected an exception to that rule even if issues involving contract and fraud theories are "inextricably intertwined" in the case. *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 666–67 (Tex. 2009); *see also Tony Gullo Motors*, 212 S.W.3d at 313 ("Intertwined facts do not make tort fees recoverable.").[13]

We reverse the trial court's award of attorney's fees to Kirmuss.

---

[13] *MBM Financial* involved a dispute between two businesses involving copy machine leases. 292 S.W.3d at 663. The prevailing party argued, *inter alia*, that it was entitled to attorney's fees for its fraud claim because the fraud "arose out of" the breach of the lease. *See id.* The supreme court stated, "We explicitly rejected this intertwining exception in *Tony Gullo Motors I, L.P. v. Chapa* and reiterated that fees are not allowed for torts like fraud. Thus, even if the Woodlands' fraud claim arose from a breach of contract, that is no basis for an attorney's fee award." *Id.* at 667 (interior citation omitted).

**Election of Remedy**

In its fifth issue, EFJ complains that Infinity was not required to elect a remedy as between its fraudulent inducement and breach of contract recoveries. We agree that neither the trial court nor Infinity made a specific election of remedies on the record.

A party is generally entitled to pursue damages through alternative theories of recovery, but it is not entitled to a double recovery. *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.,* 959 S.W.2d 182, 184 (Tex. 1998). "A double recovery exists when a plaintiff obtains more than one recovery for the same injury." *Id.* If the party receives favorable findings on two or more theories, it has a right to judgment on the theory entitling him to the greatest relief. *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.,* 747 S.W.2d 785, 787 (Tex. 1988). When the prevailing party fails to elect between alternative measures of damages, the trial court should utilize the findings affording the greater recovery and render judgment accordingly. *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 367 (Tex. 1987). If the trial court does not do so, the appellate court must determine the greatest theory of recovery and render judgment accordingly. *Main Place Custom Homes, Inc. v. Honaker*, 192 S.W.3d 604, 613 (Tex. App.—Fort Worth 2006, pet. denied).

In this case, the trial court awarded Infinity what appears to be a consistent contract recovery: actual damages, attorney's fees, and the rate of prejudgment interest (eighteen percent) provided by the Distribution Agreement. We have upheld the amount of each of these trial court awards. The jury awarded the identical amount of actual damages for Infinity's breach of contract and fraud claims. We have concluded that a fraud recovery in this case cannot support an award of attorney's fees. We conclude further (see discussion *infra*) that a fraud recovery will not support the higher prejudgment interest rate prescribed by the Distribution

Agreement. Accordingly, Infinity's contract theory of recovery yields the greater recovery, and it is entitled to that recovery.

We affirm the trial court's award to Infinity and specifically affirm that the award is for Infinity's breach of contract claim.

**CROSS-APPEAL**

Infinity and Kirmuss raise three issues in their cross-appeal. The first two issues address the trial court's award of prejudgment interest. The third issue argues the trial court should not have segregated its award of attorney's fees by party.

*Prejudgment Interest*

We review the trial court's award of prejudgment interest for an abuse of discretion. *See Bufkin*, 259 S.W.3d at 356.

In their first cross issue, Infinity and Kirmuss contend the trial court erroneously calculated the amount of prejudgment interest they are due. The trial court awarded interest beginning the 180th day after each of the cross-appellants filed suit against EFJ. However, prejudgment interest properly accrues from the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed. *Ventling v. Johnson*, 466 S.W.3d 143, 149 (Tex. 2015) (citing TEX. FIN. CODE ANN. § 304.104 (West 2006)). Because it used neither of these accrual dates in making its prejudgment interest awards, we conclude the trial court erred in awarding interest beginning 180 days after the filing of suit.

Cross-appellants point to a number of communications between the parties, alleging each of them should have given EFJ notice of their claim. However we conclude none of the communications cited by cross-appellants so clearly amount to a "written notice of a claim" that

–28–

we can—as a matter of law—say that interest should have begun to accrue on that date.[14]  *See, e.g., Robinson v. Brice*, 894 S.W.2d 525, 528 (Tex. App.—Austin 1995, writ denied) (written notice of claim under statute requires "notice of a demand for compensation or an assertion of a right to be paid").

We conclude, therefore, that prejudgment interest should have accrued from the date each of the cross-appellants filed suit.  *See* TEX. FIN. CODE ANN. § 304.104.  We sustain cross-appellants' first cross issue and conclude that prejudgment interest should have accrued on November 10, 2011 for Infinity and on April 19, 2013 for Kirmuss.

In their second issue, Infinity and Kirmuss contend Kirmuss's recovery for fraudulent inducement should bear interest at the rate of eighteen percent, just as Infinity's recovery does.  Their contention is that if Kirmuss is to receive the benefit of his bargain, then he should recover the rate of interest (as well as the attorney's fees—discussed *supra*) that he would have received under the contract.  Benefit-of-the-bargain damages include the difference between the value of the agreement as represented and the value received.  *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998).  Thus, the benefit of Kirmuss's bargain was the value he would have received from the sale of the goods EFJ promised to buy.  The Distribution Agreement's provisions for fees and interest existed for the circumstance in which that agreement was breached, not for when it would have been performed.  Kirmuss made no claim for breach of contract, so these remedies are not available to him.

We decide cross-appellants' second issue against them.

---

[14]  Indeed, even the communication identified by Infinity as "a formal notice" under the Distribution Agreement does not demand payment from EFJ.  It seeks "good faith" resolution of the problems caused by EFJ's delay in performance and it seeks to avoid "escalation" of the parties' dispute.

In their third cross issue, Infinity and Kirmuss argue the trial court should not have divided the attorney's fee award between Infinity and Kirmuss. The trial court initially awarded a single amount of fees—$1,812,235—to Infinity and Kirmuss, who were represented by the same firm at trial. EFJ then sought segregation of the fees between the two plaintiffs. The trial court subsequently signed a new judgment that awarded Infinity $1,276,913 in attorney's fees and Kirmuss $535,322. Cross appellants contend this segregation between plaintiffs was error because their claims are inextricably intertwined.

"The general rule is that attorney's fees attributable to other defendants and other causes of action must be segregated." *Flagship Hotel, Ltd. v. City of Galveston*, 117 S.W.3d 552, 565 (Tex. App.—Texarkana 2003, pet. denied) (citing *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10–11 (Tex. 1991) and *Aetna Cas. & Sur. v. Wild,* 944 S.W.2d 37, 40 (Tex. App.—Amarillo 1997, writ denied)); *Wylie v. Hide-A-Way Lake Club, Inc.*, 12-12-00290-CV, 2013 WL 6797871, at *13 (Tex. App.—Tyler Dec. 20, 2013, pet. denied) (memo op.). The determination of whether attorney's fees can be segregated is a question for the court. *Aetna Cas. & Sur.*, 944 S.W.2d at 41.

The cross appellants rely upon *Anderson Mill Municipal Utility District v. Robbins*, No. 03-04-00369-CV, 2005 WL 2170355 (Tex. App.—Austin Sept. 8, 2005, no pet.), to support their argument that the trial court improperly segregated the fees between them. In that case, all the plaintiffs sought the same relief for identical claims. *Id.* at *7. Thus, the court concluded that the claims were "inextricably intertwined," and one plaintiff was entitled to recover the entire original award if the other plaintiffs lost their own claims to the fees. *Id.* In this case, Kirmuss was represented for less time and for only one claim rather than the two claims urged by Infinity. Kirmuss joined the lawsuit seventeen months after Infinity filed suit. He received the benefit of

his attorney's earlier work concerning the fraudulent inducement claim, but the work was not performed for him as a client. Moreover, some significant portion of that earlier work related to Infinity's breach of contract claim, and Kirmuss made no claim for breach of contract. We conclude *Robbins* is not dispositive of this issue.

EFJ also argues there was no evidence to support the segregation of attorney's fees. Appellees' counsel filed his original affidavit seeking a single award of fees for both plaintiffs. After EFJ sought segregation of the fees by party—at the court's direction—counsel filed a second affidavit responding to EFJ's request. EFJ does not challenge this second affidavit, which apportioned the initial fee award as follows:

- $415,087.50 in hourly fees for Infinity, incurred before any legal work was performed for Kirmuss;

- $436,188.22 in hourly fees for Infinity between March 5, 2013 through January 29, 2014 ; and

- $356,881.28 in hourly fees for Kirmuss between March 5, 2013 through January 29, 2014.

The affidavit explained that the apportionment of approximately fifty-five percent of the firm's billed time to Infinity after Kirmuss joined the suit (as opposed to approximately forty-five percent of the time apportioned to Kirmuss) was due to time spent responding to EFJ's summary judgment motion, which was lodged only against Infinity. Counsel then applied his proposed 1.5 multiplier to the apportioned figures, yielding the amounts ultimately awarded by the trial court: $1,276,913 for Infinity and $535,322 for Kirmuss. The trial court reasonably could have credited this evidence and employed it in making its award. We conclude sufficient evidence supported the trial court's apportionment.

Finally, in this case, judicial efficiency is a product of the segregation required by the trial court. We have concluded today that Kirmuss may not recover attorney's fees on his fraud claim. Because the trial court segregated the fees by party, we can reverse Kirmuss's fee award without doing violence to the award of fees to Infinity. Were the fees unsegregated, we would be forced to remand the issue of attorney's fees for a new trial. *See Tony Gullo*, 212 S.W.3d at 314–15; *see also Brown v. Zimmerman*, 160 S.W.3d 695, 705 (Tex. App.—Dallas 2005, no pet.) (appeal after remand that was based on failure to segregate fees between parties).

We conclude the trial court did not abuse its discretion by segregating its attorney's fee award between Infinity and Kirmuss. We conclude further that sufficient evidence supported the actual segregation. We decide this issue against both EFJ and the cross appellants.

## CONCLUSION

We reverse the trial court's award of attorney's fees to Kirmuss. We modify the trial court's judgment to provide that prejudgment interest on Infinity's actual damages shall accrue on November 10, 2011. We further modify the judgment to provide that prejudgment interest on Kirmuss's actual damages shall accrue on April 19, 2013. In all other respects, we affirm the trial court's judgment.

/Michael J. O'Neill/
MICHAEL J. O'NEILL
JUSTICE, ASSIGNED

141209F.P05

–32–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

E.F. JOHNSON COMPANY, Appellant

No. 05-14-01209-CV        V.

INFINITY GLOBAL TECHNOLOGY
F/K/A INFINITY GEAR AND
TECHNOLOGY, LLC, and CHARLES
KIRMUSS D/B/A KIRMUSS &
ASSOCIATES, Appellees

On Appeal from the 95th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-11-14303-D.
Opinion delivered by Justice O'Neill,
Justices Fillmore and Stoddart participating.

In accordance with this Court's opinion of this date:

We **REVERSE** the trial court's award of attorney's fees to Charles Kirmuss d/b/a Kirmuss & Associates.

We **MODIFY** the trial court's judgment as follows:

Prejudgment interest on Infinity Global Technology f/k/a Infinity Gear and Technology, LLC's actual damages shall accrue on November 10, 2011, and prejudgment interest on Charles Kirmuss d/b/a Kirmuss & Associates's actual damages shall accrue on April 19, 2013.

It is **ORDERED** that, in all other respects, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Infinity Global Technology f/k/a Infinity Gear and Technology, LLC, and Charles Kirmuss d/b/a Kirmuss & Associates recover their costs of this appeal from appellant E.F. Johnson Company.

Judgment entered this 11th day of August, 2016.